UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JAMES H. POGUE                                                                                          PLAINTIFF

v.                                                              CIVIL ACTION NO. 3:14-CV-00598-CRS

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY                                                                            DEFENDANT

# MEMORANDUM OPINION

## I.   Introduction

This matter is before the court on defendant Northwestern Mutual Life Insurance Company's ("Northwestern Mutual") motion to exclude plaintiff James H. Pogue's ("Pogue") rebuttal expert opinions and related testimony. ECF No. 124-1. For the reasons below, the court will grant the motion.

## II.   Case Background

Pogue is a physician who previously practiced medicine in Nashville, Tennessee. ECF No. 124-1, p. 2. Pogue filed suit against Northwestern Mutual in 2014, claiming breach of contract, breach of the duty of good faith and fair dealing, violations of the Unfair Settlement Practices Act, and violations of the Consumer Protection Act, all based on the insurance company's denial of his long term disability claim. Pl.'s Compl., ECF No. 1-2, ¶¶ 9-26.

Pogue submitted a request for disability benefits to Northwestern Mutual dated April 28, 2013. ECF No. 124-4, p. 3. In his request, Pogue stated that he suffered from a "severe anxiety disorder" and that "on November 9, 2012 [he] had a total nervous breakdown and could no longer think clearly enough to practice medicine." *Id.* He also stated that he suffered from

1

"severe tinnitus, blurred vision, abdominal pain, dizziness, fatigue, and [headaches]" of an undetermined cause. *Id.* Pogue noted in his request that he "voluntarily surrender[ed] his [medical] license due to a feeling of personal incompetence to handle work stresses as of Nov. 9, 2012." *Id.* at 7.

After reviewing Pogue's request, Northwestern Mutual issued a denial letter on November 9, 2014, stating that it did "not find proof of disability" and believed that Pogue "made intentional, and even fraudulent, misrepresentations throughout [his] claim in order to deceive Northwestern Mutual into providing benefits. . ." ECF No. 124-5, p. 8. The insurance company pointed to several discrepancies in the information Pogue provided. Of particular significance was a decision by the Tennessee Board of Medical Examiners dated November 20, 2012—less than two weeks after Pogue's alleged nervous breakdown—suspending Pogue's medical license due to his improper prescribing of controlled substances to patients and family members. *Id.* at 6. Northwestern Mutual referred to Pogue's insurance contract, which states that "there will be no benefits for a disability or loss that results from or is caused by or contributed to by the suspension, revocation, or surrender of a professional or occupational license or certificate." *Id.* at 8. Northwestern Mutual concluded that "although [Pogue] may [have had] a nervous breakdown on November 9, 2012 . . . [it] was unable to establish proof that, apart from [his] licensing issues, [he had] been unable to perform the duties of [his] occupation because of a disabling psychiatric illness." *Id.* Pogue appealed this denial twice, and in both instances Northwestern Mutual upheld the claim denial. ECF No. 117-4; ECF No. 117-5.

In anticipation of trial, Pogue provided Northwestern Mutual with his expert disclosures on October 15, 2015. ECF No. 129-3. He indicated that he anticipates calling on Dr. Roy Asta, his treating psychiatrist, and Dr. Bracken Lewis, his treating physician, to testify. *Id.* The

disclosure states that "[e]ach of these medical providers is expected to provide expert medical opinions that [Pogue's] physical and mental restrictions and limitations prevent [him] from performing each of the principal duties of a medical doctor." *Id.*

Northwestern Mutual then disclosed its seven expert witnesses on February 15, 2016. ECF No. 47-2. Two of these experts, Dr. Dennis Buchholz and Dr. Sara Swanson, are neuropsychologists. *Id.* Dr. Buchholz was retained by Northwestern Mutual in August 2013 to conduct neuropsychological testing on Pogue in connection with his claim and will testify as to the results and his conclusions. *Id.* at 4. Dr. Swanson was retained by Northwestern Mutual in anticipation of litigation and will testify to "her opinion that [Pogue] has no cognitive limitations or impairments that [prevent] him from performing his occupational duties as a physician." *Id.* at 2.

On August 8, 2016, Pogue disclosed his rebuttal expert witness, Dr. Michael Cecil ("Dr. Cecil"). ECF No. 128-2. The disclosure states that Dr. Cecil has been retained to provide his "expert medical opinion as to Dr. Pogue's ability to engage in the duties of a physician from November 2012 to date." ECF No. 128-3, ¶ 2. In his expert report, Dr. Cecil concludes that:

(1) Dr. Pogue should be regarded as an individual with moderate brain functioning disability.

(2) Dr. Pogue is not capable of returning to his previous position as a physician given his significant neuropsychological deficits.

(3) The etiology of Dr. Pogue's functional limitations is organic and physical in nature, caused by brain trauma.

(4) Dr. Pogue's functional limitations, preventing him from performing the duties of a physician, have been present since at least November 9, 2012. *Id.* at ¶ 37.

Northwestern Mutual now moves to exclude Dr. Cecil's expert testimony, claiming that it is outside the scope of rebuttal testimony under Federal Rule of Civil Procedure 26(a)(2)(D)(ii), or alternatively, that it is unreliable under Federal Rule of Evidence 702.

III. Legal Standard

Federal Rule of Civil Procedure 26(a)(2)(D)(ii) governs the scope of rebuttal expert testimony. This Rule describes rebuttal expert testimony as evidence "intended solely to contradict or rebut evidence on the same subject matter" discussed by another party's expert witness. Fed. R. Civ. P 26(a)(2)(D)(ii). There is little guidance on what constitutes 'the same subject matter,' but courts have "been reluctant to narrowly construe the phrase . . . beyond its plain language." *T.C. Systems, Inc. v. Town of Colonie, New York*, 213 F.Supp.2d 171, 180 (N.D.N.Y July 19, 2002). Rebuttal experts can use "new methodologies" to refute the opinions of other experts. *Park West Radiology v. Carecore Nat. LLC*, 675 F.Supp.2d 314, 316 (S.D.N.Y. Nov. 19, 2009). However, rebuttal experts cannot merely supplement the opinions of experts from the party's case-in-chief or "advance new arguments or new evidence" for the case. *Madison Capital Co., LLC v. S & S Salvage, LLC*, 2011 WL 195639 (W.D.Ky. Jan. 19, 2011); *Bentley v. Highlands Hospital Corp.*, 2016 WL 5867496 at *5 (E.D.Ky. Oct. 6, 2016) (quoting *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 17 (D.D.C. May 1, 2013)).

Federal Rule of Evidence 702 limits the content of rebuttal expert testimony. This rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;

(c) The testimony is the product of reliable principles and methods; and

(d) The expert has reliably applied the principles and methods to the facts of the case.

According to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993), trial judges serve as "gatekeepers" under Rule 702 to ensure that opinions offered by expert witnesses meet the thresholds for reliability and relevance. This is true whether "the testimony is based on 'scientific' knowledge" or "technical [or] other 'specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999). The appropriate inquiry for determining whether expert testimony is reliable will depend in large part on the subject matter, and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."[1] *Id.* Notwithstanding this flexibility, the role of a trial judge is to assess the "principles and methodology" used by experts, not the conclusions they ultimately reach. *Daubert*, 509 U.S. at 595. The traditional tools of the adversarial system, including "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," are still adequate "means of attacking shaky but admissible testimony." *Id.* at 597 (citing *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L.Ed.2d 37 (1987)).

---

[1] In *Daubert*, the Court included a non-exhaustive list of factors that could be used in assessing the reliability of an expert's opinion, including (1) "whether it can be or has been tested;" (2) "whether [it] . . . has been subject to peer review and publication;" (3) whether there is a "known or potential rate of error," and (4) whether it enjoys "general acceptance . . . in the relevant scientific community." *Daubert*, 509 U.S. at 594. While these factors are helpful in assessing the reliability of opinions based on scientific studies, they are less relevant when assessing an expert's diagnosis of a particular individual's condition, as we have in this case.

IV.   Discussion

a. Admissibility of Dr. Cecil's Rebuttal Expert Testimony under Fed. R. Civ. P. 26(a)(2)(D)(ii)

Northwestern Mutual argues that Dr. Cecil's testimony should be excluded because it is outside the scope of rebuttal testimony under Federal Rule of Civil Procedure 26(a)(2)(D)(ii). It states that Dr. Cecil's report "offers new theories and factual findings," which go "far beyond attempting to rebut the opinions offered by Northwestern Mutual's experts and consultants." ECF No. 124-1, p. 20. Accordingly, it argues that Dr. Cecil's opinions should be excluded." *Id.* The court disagrees.

Pogue retained Dr. Cecil to rebut the opinions of Dr. Dennis Buchholz and Dr. Sara Swanson, two of Northwestern Mutual's expert witnesses. ECF No. 128, p. 21. Dr. Buchholz performed neuropsychological testing on Pogue in August 2013 in connection with his disability claim. ECF No. 124-10, p. 2. His expert report discusses the results of these tests and ultimately concludes that Pogue's "observed psychomotor slowing is most likely due to functional psychological factors rather than neurological disease." *Id.* at 8. Dr. Cecil directly responds to this conclusion in his rebuttal report, stating that:

> The significant impairments noted in Dr. Buchholz['s] [report] were improperly characterized as solely representative of cognitive slowing and failed to consider whether Dr. Pogue's impaired testing results were caused by his underlying brain dysfunction. In the context of superior scores that Dr. Pogue produced, these impaired scores are only suggestive of functional brain impairment. ECF No. 128-3 ¶ 30.

Dr. Cecil's opinion contradicts Dr. Buchholz's opinion as to the cause of Pogue's psychomotor slowing.

Dr. Swanson reviewed Pogue's psychological and psychiatric evaluations on behalf of Northwestern Mutual to determine whether Pogue has "vocational limitations as a result of neuropsychological impairment." ECF No. 124-11, p. 1. She concludes that there is "no support

6

for cognitive limitations," but rather, evidence of "symptom fabrication [that] is typical of malingering." *Id.* at 5. Dr. Cecil disagrees with this finding, stating that "[i]t is based on a flawed analysis and scoring of Dr. Buchholz's testing results." ECF No. 128-3, ¶ 36. His evaluation of Pogue, by contrast, reveals several cognitive limitations, including "impaired processing speed scores . . . impaired semantic fluency and immediate and delayed auditory memory . . . [and] impaired fine motor speed scores," which he concludes will prevent Pogue from returning to work as a physician. *Id.* at ¶ 21. Dr. Cecil's opinion contradicts Dr. Swanson's opinion as to the extent of Pogue's cognitive limitations and his ability to return to the practice of medicine.

Although Dr. Cecil does offer a new finding—that Pogue suffers from brain trauma—this still falls within the scope of rebuttal expert testimony. Dr. Cecil does not offer this conclusion independently, but rather relies on it in challenging the opinions of Dr. Buchholz and Dr. Swanson. Both Dr. Buchholz and Dr. Swanson conclude that Pogue's limitations, if any, are purely psychological and do not prevent him from returning to work as a physician. Dr. Cecil, by contrast, asserts that Pogue's limitations are caused by brain trauma and *will* inhibit his ability to work as a physician. Because Dr. Cecil's opinions respond to Northwestern Mutual's experts' opinions, they are within the scope of rebuttal testimony.

b.  <u>Admissibility of Dr. Cecil's Rebuttal Expert Testimony under Fed. R. Evid. 702</u>

Northwestern Mutual alternatively argues that Dr. Cecil's rebuttal expert testimony should be excluded under Federal Rule of Evidence 702, both because he lacks sufficient expertise to opine about Pogue's neuropsychological condition, and because his opinions are unreliable.

7

i. <u>Dr. Cecil's Qualifications</u>

Northwestern Mutual first contends that Dr. Cecil does not possess the "knowledge, skill, experience, training, or education" requisite for providing expert testimony as to the cause of Pogue's alleged neuropsychological deficits. ECF No. 124-1, p. 17. It points out that Dr. Cecil is a psychologist rather than a board certified neuropsychologist and claims that diagnosing "the etiology of [Pogue's] alleged disability" is "well outside his experience of counseling patients and families." *Id.* The court disagrees.

Dr. Cecil received his Doctorate in Clinical Psychology from Wright State University School of Professional Psychology in 2000. ECF No. 128-4, p. 1. During his doctoral study, he completed an internship in clinical psychology on a neuropsychology track at the University of Texas. *Id.* Upon completion of his doctorate, Dr. Cecil served as a clinical neuropsychologist at Frazier Rehab Institute, where his responsibilities included providing "neuropsychological evaluations . . . psychotherapy to individuals with brain-injury, [and] outpatient neuropsychological and forensic evaluations and treatment." *Id.* at 2. From there, Dr. Cecil continued to practice as a clinical neuropsychologist at Columbus Regional Hospital, where he performed "inpatient [and] outpatient comprehensive neuropsychological evaluations" for neurologists and neurosurgeons, and engaged in "[w]eekly consultation with neurologists regarding neurological findings, results of neuroimaging, and neuropsychological evaluation results." *Id.* Dr. Cecil currently serves as the President and CEO of Louisville Neuropsychology, a "private practice dedicated to evaluating and treating individuals with neuropsychological and psychological disorders." *Id.* at 1.

Dr. Cecil's lack of board certification does not in itself disqualify him from testifying to the cause of Pogue's neuropsychological deficits. An expert witness "need not have certificates

of training [or] memberships in professional organizations," or even be "an outstanding practitioner in the field in which he professes expertise." *U.S. v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977) (citing *Tank v. Commissioner*, 270 F.2d 477, 478 (6th Cir. 1959)). Indeed, the Advisory Committee's notes on the 2000 Amendment to Rule 702 state that "[n]othing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training, or education—may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Rather, the correct inquiry for determining whether an individual may testify as an expert on a particular topic is whether that person's "knowledge of the subject matter is such that his opinion will most likely assist the trier of fact in arriving at truth." *Barker*, 553 F.2d at 1024 (quoting *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856, 858 (8th Cir. 1975)).

The court finds that Dr. Cecil's extensive professional background in the field of neuropsychology qualifies him to testify as to the cause of Pogue's alleged neuropsychological deficits. Of particular relevance is his experience providing neuropsychological evaluations and treatment to individuals with brain injuries. His knowledge of this subject matter could be helpful to the jury in determining the facts at issue in this case. Dr. Cecil is qualified to opine as to the cause of Pogue's alleged neuropsychological deficits.

  ii. <u>Reliability of Dr. Cecil's Opinions</u>

Northwestern Mutual next contends that Dr. Cecil's opinions are not reliable. Specifically, it states that he does not have adequate scientific or factual bases to opine that (1) Pogue's alleged neuropsychological deficits were caused by brain trauma, (2) the alleged deficits make Pogue incapable of returning to the practice of medicine, and (3) the alleged deficits have been present since at least November 9, 2012. These opinions will be addressed in turn.

9

1. <u>Conclusion that Pogue Suffers From Brain Trauma</u>

Northwestern Mutual argues that Dr. Cecil does not have an adequate scientific or factual basis to opine that Pogue's alleged neuropsychological deficits were caused by brain trauma. ECF No. 124-1, p. 14. It notes that Pogue "never gave a history of traumatic brain injury to Northwestern Mutual" or to any of the "independent medical consultants who examined him in connection with his disability claim." *Id.* at 16. Moreover, none of the "extensive and detailed histories gathered by [Pogue's] treaters make [any] mention of concussions or traumatic brain injury." *Id.* Based on this, Northwestern Mutual contends that Dr. Cecil's "bare conclusion" is inadmissible. *Id.* The court agrees.

Dr. Cecil concludes that "[t]o a reasonable degree of medical certainty . . . [t]he etiology of Dr. Pogue's functional limitations is organic and physical in nature, caused by his brain trauma." ECF No. 128-3, ¶ 37. His primary basis for this conclusion is a 3T MRI of Pogue's brain showing "corpus callosal tract cutoffs that *could* be associated with trauma." *Id.* at ¶ 21 (emphasis added). He notes that this etiology "explains [Pogue's] impaired speed processing scores," as well as his "extreme anxiety and panic attacks, anti-social and social avoidance . . . [and] impaired memory and ability to engage in complex tasks," all of which he claims are manifestations of brain trauma. *Id.* at ¶¶ 21, 26.

Dr. Cecil's conclusion is at most a "working hypothesis" and does not rise to the level of 'scientific or technical knowledge' required under Rule 702. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 669 (6th Cir. 2010). Although Dr. Cecil finds that the results of Pogue's 3T MRI "*could* be associated with trauma," he fails to take the next step in establishing that corpus callosal tract cutoffs are, to a reasonable degree of medical certainty, caused by brain trauma. ECF No. 128-3, p. ¶ 21 (emphasis added). Dr. Cecil does not point to anything from Pogue's

extensive medical history or patient interview suggesting that he ever suffered from brain trauma. Moreover, he does not point to any literature which might show an exclusive causal relationship between brain trauma and corpus callosal tract cutoffs, or rule out other possible causes for this condition. Rather, he points to a handful of symptoms that are associated with brain trauma, and then leaps to the conclusion that Pogue's limitations are the result of brain trauma. While some of Pogue's symptoms are linked to brain trauma, they are also linked to a variety of other disorders, some organic and some psychiatric.

It is well established that "the '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz*, 620 F.3d 665 at 671 (6th Cir. 2010) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Rule 702 requires that an expert's opinions be "supported by appropriate validation—i.e. 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 589. It is not the court's role to fill in the "analytical gap between the data and the opinions offered." *General Elec. Co.*, 522 U.S. at 146; *See also Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1361 (6th Cir. 1992) ("The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issues . . . is too wide."); *Rodrigues v. Baxter Healthcare Corp.*, 567 Fed. Appx. 359, 361 (6th Cir. 2014) ("[T]his unexplained conclusion failed to connect the dots . . ."). In this case, the gap between the evidence Dr. Cecil presents and the conclusion he ultimately reaches is simply too wide. Accordingly, the court finds that Dr. Cecil does not have an adequate scientific or factual basis for opining that Pogue's alleged limitations are the result of brain trauma.

    2. <u>Conclusion that Pogue is Incapable of Returning to the Practice of Medicine</u>

Additionally, Northwestern Mutual argues that Dr. Cecil does not have an adequate scientific or factual basis to opine that Pogue is unable to return to the practice of medicine. It

11

states that "[Dr.] Cecil fails to provide any additional insight – he does not review the rigors of a family physician, he does not describe these alleged 'actual limitations,' and he does not explain how they might affect or limit [Pogue] in practice." ECF No. 124-1, p. 19. Without further support, Northwestern Mutual asserts that Dr. Cecil's opinion is inadmissible. *Id.* The court agrees.

Dr. Cecil concludes that "[t]o a reasonable degree of medical certainty . . . Dr. Pogue is not capable of returning to his previous position as a physician given his significant neuropsychological deficits." ECF No. 128-3, ¶ 37. The fatal flaw of this conclusion is that it is based solely on his finding that Pogue suffers from brain trauma, which the court has determined to be unreliable. Indeed, Dr. Cecil only comments on Pogue's inability to practice medicine in his review of Pogue's 2013 evaluation by the Vanderbilt University Department of Psychiatry. He states that he "disagree[s] with the conclusion that Dr. Pogue could return to practicing medicine," and notes that "the examiners did not consider or investigate Dr. Pogue's etiology and whether there was an organic physical cause which has now been determined." *Id.* at ¶ 28. Without any other basis to support this conclusion, it too will be deemed unreliable. The court finds that Dr. Cecil lacks a sufficient scientific or factual basis to opine that Pogue is unable to return to the practice of medicine.

      3. <u>Conclusion that Pogue's Condition Has Existed Since November 9, 2012</u>

Finally, Northwestern Mutual argues that Dr. Cecil fails to provide an adequate scientific or factual basis for his opinion that Pogue's alleged limitations have been present since at least November 9, 2012. It claims that Dr. Cecil "offers no facts to substantiate his opinion that a condition existed almost four (4) years before he even saw [Pogue]." ECF No. 124-1, p. 18. The court agrees.

Dr. Cecil concludes that "[t]o a reasonable degree of medical certainty . . . Dr. Pogue's functional limitations, preventing him from performing the duties of a physician, have been present since at least November 9, 2012." ECF No. 128-3, ¶ 37. However, Dr. Cecil did not conduct his evaluation of Pogue until 2016. His only attempt to link Pogue's alleged condition to November 9, 2012 is his commentary on Pogue's psychiatry records, which date back to 2005. He states that Pogue's records show that he has "extreme anxiety and panic attacks, anti-social and social avoidance, as well as impaired memory and ability to engage in complex tasks . . . which are each the expected result of a person . . . who is suffering from the effects of brain trauma." *Id.* at ¶ 26. This conclusion—like the one regarding Pogue's inability to return to practicing medicine—is premised on the unreliable finding that Pogue suffers from brain trauma. There is no other evidence in Dr. Cecil's report indicating that Pogue's alleged limitations have existed since November 9, 2012. Therefore, the court finds that Dr. Cecil lacks a sufficient scientific or factual basis to support this conclusion.

As the Sixth Circuit stated in *Tamraz v. Lincoln Electric Company*, 620 F.3d 665, 671 (6th Cir. 2010), the phrase "'to a reasonable degree of medical certainty'—the conclusion by itself—does not make . . . an opinion admissible." Dr. Cecil fails to provide an adequate foundation for his conclusion that Pogue suffers from brain trauma. He then uses this unfounded conclusion as a basis for the remainder of his opinions. Because of this, the court finds that Dr. Cecil's opinions and related testimony are inadmissible under Rule 702.

V. <u>Conclusion</u>

For these reasons, the court will grant Northwestern Mutual's motion to exclude Pogue's rebuttal expert opinions and related testimony. An order will be entered in accordance with this memorandum.

September 22, 2017

**Charles R. Simpson III, Senior Judge
United States District Court**